*MONCURR, P.,
delivered the opinion of the court:
This is a supersedeas to a judgment of the District Court holden at Fredericks-burg, reversing a judgment of the Circuit Court of Fauquier quashing a forthcoming bond and the execution under which it was given, upon the ground that the execution was issued contrary to the first section of the act commonly called the stay law, passed March 2, 1866, entitled “an act to stay the collection of debts for a limited period.” Acts 186S-6, p. 180. The first section enacts, that no execution, &c., shall be issued, except in the cases thereinafter provided for, until the 1st day of January, 1868. The second section declares, that the foregoing section shall not apply to any case in which the debt or liability sought to be enforced was contracted or incurred since the 2d day of April, 1865, &c. The third section provides, that “no security or undertaking of any sort, the consideration of which is a debt contracted or liability incurred prior to the second day of April, 1865, shall, though executed or assumed after that day, be considered as a debt contracted, or liability incurred, after that day, within the meaning of this act. And when a part of the consideration of any security or undertaking of any sort is a debt contracted, or a liability incurred, prior to the 2d day of April, 1865, such security or undertaking, though executed or assumed on or after that day, shall, as to so much of the money due thereon, be considered as a debt contracted or liability incurred before that day, within the meaning of this act.” The only question we are called upon to decide in this case is, whether it conies within the true intent and meaning of the said third section? No question is raised as to the constitutionality of the stay law. On the contrary, the defendant in error, by his counsel, requested that no such question should be decided in the case. We will, therefore, proceed to consider and dispose of the case without reference to that question.
*The facts of the case are set out in a bill of exceptions taken by the defendant in error Rixey' to the judgment of the Circuit Court quashing the execution and forthcoming bond as aforesaid. Those facts are substantially as follows :
That in the year 1864 an agreement was made between the plaintiff in error C. H. Utterbach and one Silas H. Turner that the said Turner should purchase tobacco, for which said Utterbach was to furnish the money, and the profits arising therefrom was to be divided between them. Thereafter Turner purchased from Rixey, without communicating to him his arrangement with Utterbach, a lot of tobacco which went into the hands of Utterbach. Turner having paid to Rixey all that was due him on account of said tobacco except the sum of $2,700, “which was payable in Southern State funds (bankable) ;” and being anxious to pay the same, procured from said Utter-bach an order drawn by him in April, 1864, on Delaplane, of Richmond, payable to Turner, for $2,700 “in Southern State funds (bankable) which order he placed in the hands of Rixey, who was going to Richmond, to collect and apply the proceeds, if collected, to the debt of Turner to Rixey. The order was protested by Delaplane; and thereupon Rixey offered to re-deliver the same to Turner; but at the request of Turner, Rixey retained possession of the order as collateral security for the amount due upon the purchase of tobacco. Rixey was not aware of Utterbach’s transactions with Turner, further than t-he information afforded by the order on Delaplane, and had no communication with Utterbach until about the 20th of October, 1865, when he was sought by Utterbach, who proposed to settle with him the order on Delaplane by paying a smaller sum in United States currency. Just before this, Turner had offered to pay Rixey his said debt in United States currency at the rate of twenty - two per *cent., which offer was declined. Utterbach, in his said interview, offered to pay him twenty-three per cent, in such currency, which was supposed to be less than its market value; which offer Rixey accepted, in consideration of the payment to be then received, and which was agreed to be taken, and was taken, in the form of a note drawn by said Utterbach, dated October 20, 1865, for six hundred and seventy-six dollars and eighty-nine cents, with interest from date, payable sixty days after date to said Rixey or order, negotiable and payable at the First National Bank at Alexandria, Virginia, and endorsed by Charles Bragg and R. R. Ut-terbach. The drawer of said negotiable note, the said C. H. Utterbach, assured the said Rixey and Charles Bragg, one of the endorsers, that it would certainly be paid at maturity, and the said note would not have been accepted but for that assurance. The said Rixey, upon the giving of sdid negotiable note, and in consideration thereof, thereupon released and discharged the said Turner from all liability to him on account of the purchase of said tobacco, and delivered up the order on Delaplane to said Ut-terbach. The said negotiable note was not paid at maturity, though deposited at the said bank for' collection, but was duly protested for non-payment, and due notice of such non-payment and protest was given to the drawer and endorsers. After the protest of the note, and while it was in the hands of a third party, to whom Rixey had delivered it, Utterbach the drawer repeatedly promised in writing to pay it, his last promise in writing to pay it being on the 4th to pay it on the 6th day of August, 1866. The judgment on which the execution was issued,, which was quashed in this case, was obtained on the said negotiable note by Rixey the payee, against Utterbach the drawer thereof.
The first section of the act before referred *628 to, standing alone, clearly embraces this case. The second as clearly *excepts it from the operation of the first; this being a case in which the debt or liability sought to be enforced was contracted or incurred since the 2d day of April, 1865, and the only question is, whether the third section takes the case out of the operation of the second, and restores it to the operation of the first; that is, whether the negotiable note dated October 20, 186S, on which the judgment was obtained, which was the foundation of the 'execution and forthcoming bond that were quashed, is a security or undertaking, the consideration of which was a debt contracted or liability incurred prior to the second day of April, 1865, within- the meaning of the said third section?
This section is certainly very broad in its terms: “No security or undertaking of any sort, the consideration of which is a debt contracted,” &c. ; though not broader than the second section, which declares that “the foregoing section (that is the first) shall not apply to any - case in which the debt or liability sought to be enforced was contracted,” &c. But surely it was not designed by the Legislature to include in the operation of the third section every security and undertaking made since the 2d day of April, 1865, founded in any manner or to any extent whatever, directly or indirectly, on the consideration arising from a debt contracted or a liability incurred prior to that day. Surely the Legislature did not intend to attach to all debts contracted before that day such an indelible stain as that they could not, by any combination with other elements, be made a sufficient consideration for a debt contracted after that day to bring it within the operation of the second section of the act. Then where is the line to be drawn between securities and undertakings executed or assumed after the 2d day of April, 1865, in consequence of a debt contracted or liability incurred prior to that day, which are within the saving of the second section, and such ^securities and undertakings which are not within the saving of that section?
Without undertaking to draw the precise line so as to ascertain what cases lie on one side and what on the other side of it, we think we may safely say, that wherever the creditor gives up a substantial part of the old debt, or the liability of a person bound to him for its payment, in consideration of the new security for the payment of the debt or any part of it, such new security comes within "the saving of the second section, and may be enforced according to its terms, notwithstanding the stay law. In this case, it cannot be said that the consideration of the new security is the old debt within the meaning of the third section. “The consideration,” within that meaning, is where the old debt forms the whole consideration of the new security, and does not embrace a consideration compounded of the old debt and other elements of value. Where the old debt is the sole consideration of the new security, it is regarded by the act as the same debt, although the security is changed; and that, too, although the creditor may have been benefited by the change, as where he gets additional security. But where a substantial part of the debt is given up, or the liability of some person bound for the old debt is released, in consideration of the new security, there has been such a novation 'of the debt as brings it within the saving of the second section. If this were not so, the stay law would deprive a debtor of the power of,making any composition with his creditors for his relief from debt, or for the release of any of his sureties. A creditor being stayed by the law in the enforcement of his debt, might be willing to give up a part of it, and even give up the liability of a surety, provided he could get a new security of the debtor for -the payment of a certain sum at a certain time. If the law denies to the debtor the right to give such a security which the creditor *may enforce, ’does him an injury instead of a benefit. He may surely waive a benefit which the law intended to provide for him, especially if by so doing he can secure what he esteems to be a greater benefit. Whenever a creditor gives up a substantial part of the debt, or releases a person who may be bound for it, in consideration of a new security given for the payment of a certain sum at a certain time, it may fairly be inferred to be the intention' of both parties that payment shall be made at that time, notwithstanding the stay law.
There is nothing in the latter part of the third section which is inconsistent with this view. The meaning of that provision is, that where a security or undertaking is executed or assumed after the 2d day of April, 1865, for a sum of money composed, among other things, of a debt contracted or liability incurred prior to that day, such security or undertaking shall, as to so much of the money due thereon, be considered as a' debt contracted or liability incurred before that day, within the meaning of the act. The several portions of the sum of money for which the security is executed or the undertaking assumed in that case being wholly independent of one another, no alteration is thereby effected in the nature of the former debt within the meaning of the act. But this is very different from a case in which a part of the former debt is given up or the liability “of another person therefor is released in consideration of the new security.
And now let us apply the principle which we have laid down to the facts of this case. About the 20th of October, 1865, Turner and Utterbach were indebted to Rixey in the value of $2,700 in “Southern State funds (bankable)” as of the month of April, 1864, in the city of Richmond, that being the amount of the order which in the latter month and year was drawn by Ut-terbach on Delaplane in favor of Turner, and by him passed to Rixey, to *629 *be collected and applied to a debt of the same amount then due to him by Utterbach and Turner, but which order was protested by Delaplane as aforesaid. Being so indebted, Turner offered to pay the debt to Rixey in United States currency' at twenty-two per cent., which offer was declined. The fair inference from this statement is, that this offer was to make the payment in cash. So that Rixey might at that time have received payment of the debt of Turner in United States currency, at the rate of twenty-two per cent., but declined to do so, no doubt because he thought the rate was too low. Shortly thereafter, Utterbach sought an interview with Rixey, and “offered to pay him twenty-three per cent, in such currency, which was supposed to be less than its market value; which offer the said Rixey accepted, in consideration of the payment to be then received, and which was agreed to be taken, and was taken, in the form of the negotiable note aforesaid, and which said negotiable note the said Utterbach assured the said Rixey and Charles Bragg, one of the endorsers, would be certainly paid at maturity. Said note would not have been accepted but for said assurance. Said Rixey, upon the giving of said negotiable note, and in consideration thereof, thereupon released and discharged the said Turner from all liability to him on account of the purchase of said tobacco, and delivered up the said Delaplane’s order to said Utter-bach.” Now here it appears that Rixey, on or about the 20th of October, 1865, might have received in cash the amount of his debt in United States currency at twenty-two per cent., but declined doing so ; and at or about the same time, accepted an offer of twenty-three per cent, in such currency, which was supposed to be less than its market value. Supposed by whom? The fair inference is, by both parties, or generally. There is nothing in the record to show what was the value of “Southern State *funds (bankable)” in April, 1864, or even what was the precise nature of the funds referred to, though the presumption is they were Southern bank notes, receivable at bank in payments or on deposit. Nor can the court judicially know what was the value of such funds. Dess than the amount of the debt may have been offered and accepted in satisfaction thereof, in consideration of its immediate payment, notwithstanding the stay law enacted by the Legislature at Alexandria on the 23d of January, 186S — Acts of Assembly, p. 7, ch. 7 — which was then in force; “which offer the said Rixey accepted, ’ ’ as the bill of exception states, ‘ ‘in consideration of the payment to be then received. ’ ’ So that the payment was considered in effect as a cash payment. “And which,” as the bill of exceptions proceeds to state, ‘was agreed to be taken (and was taken) in the form of the negotiable note aforesaid, and which said negotiable note the said Utterbach assured the said Rixey and Charles Bragg, one of the endorsers, would be certainly paid at maturity.” The transaction, then, was the same in effect as if the money had been actually paid to Rixey, and by him immediately loaned to Utterbach upon his negotiable note at sixty daj's, endorsed by Bragg, which Utterbach assured Rixey and Bragg would certainly be paid at maturity. It is fair to presume from the evidence, that Rixey did not get a cent more by taking the note than he would have accepted in cash. The note was, in effect, a new transaction and a new debt, though created in consequence of the old one. But something of still more importance yet remains to be stated to give this character to the note. Not only is it stated in the bill of exceptions that the “note would not have been accepted but for said assurance,” but it is further stated, “that said Rixey, upon the giving of said negotiable note, and in consideration thereof, thereupon released and discharged the said Turner *from all liability to him on account of the purchase of said tobacco, and delivered up the said Delaplane order to said Utterbach.” In other words, Rixey, in consideration of the negotiable note, and the assurance which was given of its certain payment at maturity, released and discharged his original debtor, who had just before offered to pay him in cash only one per cent, less of the original debt than the amount of the said note, and delivered Up the order which he had been holding as collateral security, and which operated as an equitable assignment of so much of what might haye been due, if anything, by Delaplane to Utterbach. Upon the principle before laid down, the case clearly comes within the operation of the second and not of the third section of the act of March 2, 1866, aforesaid.
We are, therefore, of opinion to affirm the judgment of the District Court.
Judgment of the District Court of Appeals affirmed.